Ronald Jeffrey NEER, derivatively on behalf of Stonepath Group, Inc.,

v.

Dennis L. PELINO, et al.

No. CIV.A. 04–4791.

United States District Court, E.D. Pennsylvania.

Sept. 27, 2005.

Marc M. Umeda, Robbins, Umeda & Fink, LLP, San Diego, CA, Steven A. Schwartz, Chimicles & Tikellis, LLP, Haverford, PA, for Plaintiff.

Howard D. Scher, Steven E. Bizar and Thomas P. Manning, Buchanan Ingersoll, PC, Philadelphia, PA, for Defendants.

*MEMORANDUM*

DALZELL, District Judge.

Plaintiff Ronald Jeffrey Neer, a shareholder in Stonepath Group, Inc. ("Stonepath"), here sues nominal defendant Stonepath and fourteen of its current and former officers and directors in this shareholder derivative action. He alleges violations of the Sarbanes–Oxley Act of 2002, breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment that happened between January 1, 2001 and now. Stonepath allegedly suffered large losses and damages.

Defendants move to dismiss for lack of subject matter jurisdiction, lack of standing, time-barred claims, and lack of personal jurisdiction. We now address that motion.[1]

---

1. The Court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all

*Factual Background*

Stonepath is said to be "a non-asset based third-party logistics services company." Am. Compl. ("Compl.") ¶ 5. It is incorporated in Delaware and maintains its headquarters in Philadelphia. *Id.* ¶ 26. The company derives income primarily from freight forwarding, customs brokerage, and warehousing and other valueadded services. *Id.* ¶¶ 1, 7. As a freight forwarder, Stonepath does not own or lease any significant equipment. *Id.* ¶ 7. It generates most revenues "by purchasing transportation services from direct (asset-based) carriers" to transport the property of Stonepath's customers. *Id.*

Stonepath is said to have issued four restatements—in August and November of 2003, January, 2004 and January, 2005—that modified financial statements earlier filed with the Securities and Exchange Commission ("SEC" or "Commission"), and further restatements are said to be expected.

Specifically, on August 28, 2003, Stonepath issued its first restatement, which corrected previously reported financial data that had been obtained using improper methods to account for depreciation and amortization. *Id.* ¶¶ 11, 97. This restatement covered fiscal years ("FY") 2001 and 2002 and the first two quarters of 2002 and 2003. *Id.* ¶¶ 10, 97. Net income was reduced by $262,667 (27%) for the first quarter of FY 2001, $1,185,389 (33%) for the second quarter of FY 2002, $267,223 (97%) for the first quarter of FY 2003, and $290,066 (52%) for the second quarter of FY 2003, for a combined reduction of about two million dollars.[2] *Id.* ¶¶ 11, 97, 118.

On November 17, 2003, Stonepath filed a Form 10–Q with the SEC for the third quarter of 2003, and this form also restated financial information for the second quarter of 2003. *Id.* ¶¶ 10, 104. Net income for the second quarter of 2003 was reduced by $350,834 (15%).[3] *Id.* ¶ 12.

On January 20, 2004, Stonepath issued a third restatement, this one for fiscal year 2002 and the first, second and third quarters of 2003. *Id.* ¶¶ 10, 109. This restatement corrected an overstatement of total revenue and a corresponding overstate-

well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1420 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir. 2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief"). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action." *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). We shall review factual background for plaintiff's claims with these principles in mind.

2. While the amended complaint alleges that figures for the first and second quarters of 2002 were restated, it does not provide the numbers for these quarters as it does for the other periods.

3. The amended complaint twice states that the November 2003 restatement was for the third quarter of 2002. *See* Am. Compl. ¶¶ 10, 104. However, when providing the figures for this restatement, it states that "[i]n November 2003, the Company restated its Q3:03." *Id.* ¶ 12. We assume this was a typographical error and that paragraph 12 should read "Q3:02." We thus use the amount provided in paragraph 12 to describe the second restatement.

ment of transportation costs in the same amount. *Id.* ¶¶ 13, 105. It did not alter reported net income. *Id.*

Stonepath issued a fourth restatement in January of this year, correcting information for the first and third quarters of 2003.[4] *Id.* ¶¶ 10, 20, 125. The need for this restatement had been announced on September 20, 2004, when Stonepath reported that it would restate financial statements for fiscal year 2003 and the first and second quarters of 2004. *Id.* ¶¶ 15, 126. An internal review of Stonepath's Logistics Domestic Services ("Domestic Services") subsidiary revealed the "trend analysis" method used to estimate costs of purchased transportation did not accurately account for the differences between the estimates of freight costs and the actual freight costs. *Id.* ¶ 120. As a result, actual costs were underreported. *Id.* Costs were understated for 2003 in the range of $4.0 to $6.0 million, and in the range of $500,000 to $1.0 million for the first six months of 2004. *Id.* Stonepath stated it expected the reported earnings before interest, taxes and depreciation ("EBITDA") to be reduced to the range of $2.6 to $4.6 million for 2003, and $200,000 to $700,000 for the first six months of 2004. *Id.*

The day of this announcement, on a trading volume of 4,830,200 shares, Stonepath stock closed at $0.86 per share, down 46% from the September 19, 2004 closing price. *Id.* ¶¶ 18, 123.

After the September 20, 2004 announcement, Stonepath disclosed two additional process errors concerning Domestic Services' revenue transactions.[5] *Id.* ¶¶ 19, 124. First, revenues were overstated because of a billing error. Second, an accounting error affected revenue recognition and depreciation in the second quarter of 2004. *Id.*

In the January 6, 2005 press release that announced that the restatement for the first and third quarters of 2003 had been filed, Stonepath also disclosed that, because of the accounting problems identified in its September 20, 2004 announcement, it would be reducing net income results for fiscal years 2001, 2002 and 2003, and the first six months of 2004 by $0.4 million, $2.0 million, $7.8 million and $6.1 million, respectively. *Id.* ¶¶ 21, 127. Accordingly, in future restatements, the aggregate reduction in previously reported income will be about $16.3 million for 2001 through the first six months of 2004. *Id.* ¶¶ 21, 22, 127.

From January 1, 2001 to now, Stonepath has allegedly undergone several changes in structure and personnel. First, the senior financial representatives within the Domestic Services and International Services units now report directly to the Chief Financial Officer ("CFO"). *Id.* ¶¶ 23, 130. Second, the Chief Executive Officer ("CEO") and CFO were replaced and the new position of President was created. *Id.* Third, Stonepath announced it would move the corporate headquarters to Seattle, Washington in the first half of 2005. *Id.* ¶¶ 24, 130.

On October 12, 2004, plaintiff initiated this action, and on January 19, 2005 he filed an amended complaint. The amended complaint asserts six counts, all against the fourteen Individual Defendants[6] ex-

---

4. Paragraph 10 only states that the third quarter of 2003 was covered by the January 2005 restatement, but according to paragraphs 20, 125 and 127, on January 6, 2005, Stonepath restated results for the first and third quarters of 2003. We assume that paragraph 10 inadvertently omitted the first quarter of 2003 in its description of the January 2005 restatement.

5. The complaint does not provide the date of this disclosure.

6. In addition to nominal defendant Stonepath, the defendants are Dennis L. Pelino ("Pelino"), Bohn H. Crain ("Crain"), Thomas L. Scully ("Scully"), J. Douglass Coates ("Coates"), Robert McCord ("McCord"), David R. Jones ("Jones"), Aloysius T. Lawn

cept for the first count: (1) violation of Section 304 of the Sarbanes–Oxley Act ("SarbOx") by defendants Dennis L. Pelino and Bohn H. Crain; (2) breach of fiduciary duty; (3) abuse of control; (4) gross mismanagement; (5) waste of corporate assets; and (6) unjust enrichment.

Defendants move to dismiss on four grounds: (1) lack of subject matter jurisdiction because plaintiff cannot bring suit under Section 304 of the SarbOx; (2) lack of standing due to failure to make a pre-suit demand upon the directors; (3) time-barred claims against certain Individual Defendants; and (4) lack of personal jurisdiction over certain Individual Defendants.

Because it touches on the federal question that is the keystone of this action, we first consider the SarbOx claim.

## Section 304 of the Sarbanes–Oxley Act

■ Plaintiff asserts federal jurisdiction under 28 U.S.C. § 1331, claiming that we may infer that Section 304 of SarbOx ("the Act") provides a private cause of action against defendants Pelino and Crain. He invokes our supplemental jurisdiction under 28 U.S.C. § 1367(a) to assert his five other claims.

Defendants contend that this Court does not have subject matter jurisdiction. They argue that Section 304 does not provide a private cause of action, and without the presence of a federal question, this Court should not entertain the remaining state law claims.

Section 304 provides for forfeiture of certain bonuses and profits by CEOs and CFOs when a restatement is required due

("Lawn"), John H. Springer ("Springer"), Andrew P. Panzo ("Panzo"), Lee C. Hansen ("Hansen"), Darr Aley ("Aley"), Stephen George ("George"), Michela O'Connor Abrams ("O'Connor Abrams"), Stephen M. Cohen ("Cohen") and Frank Palma ("Palma"). Defendant Pelino was Stonepath's Chief Executive Officer ("CEO") from June 21, 2001 to October 14, 2004, and its Chairman of the Board of Directors from June 21, 2001 to the present. Compl. ¶ 27. Defendant Crain served as Chief Financial Officer ("CFO") from January 10, 2002 to October 14, 2004, as Treasurer from May 30, 2002 to October 14, 2004, and as a consultant in fiscal year 2005. Id. ¶ 28. Defendant Scully was Vice–President, Controller and Principal Financial and Accounting Officer from November 19, 2001 to the present, and he was also named CFO on October 14, 2004. Id. ¶ 29. Defendant Coates has served as a Director from August, 2001 to the present. Defendant McCord has served as a Director from March, 2001 to the present, and was a member of the Audit Committee during fiscal year 2001 and resumed the position in March 2003. Id. ¶ 31. Defendant Jones is and has been throughout the Relevant Period a Director and a member of the Audit Committee and the Compensation Committee. Id. ¶ 32. Defendant Lawn has been a Director, a member of the Audit Committee and a member of the

Compensation Committee from February, 2001 to the present. Id. ¶ 33. Defendant Springer has served as a Director and a member of the Compensation Committee from May, 2003 to the present. Id. ¶ 34. Defendant Panzo was Chairman and CEO of Stonepath from January, 1999 through June, 2001 and continued as a Director through December, 2001. Id. ¶ 35. Defendant Hansen was President of Stonepath from October 1, 1999 until about June 22, 2001, and was a Director from April, 2000 until about June 22, 2001. Id. ¶ 36. Defendant Aley served as a Director from July, 1999 until at least March 15, 2001. Id. ¶ 37. Defendant George was a Director from July, 1999 until at least March 15, 2001. Id. ¶ 38. Defendant O'Connor Abrams was a member of the Board of Advisors from January, 2000 until she was appointed as a Director in September, 2000 and then served as a Director, member of the Audit Committee and member of the Compensation Committee from September, 2000 until approximately October 9, 2001. Id. ¶ 39. Defendant Cohen was Managing Director, General Counsel and Secretary from April, 2000 until about October 9, 2001. Id. ¶ 40. Defendant Palma was a Director from August, 2001 until about August 28, 2003, and he was a member of the Audit Committee and the Compensation Committee for fiscal years 2001 and 2002. Id. ¶ 41.

to an issuer's noncompliance with any financial reporting requirements of the securities law, if the noncompliance arises from misconduct. In its entirety, Section 304 states:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12–month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12–month period.

(b) Commission exemption authority

The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

15 U.S.C. § 7243 (2002).

Section 304 does not explicitly afford a private right of action,[7] and no court has ruled on whether this section creates an implied private right of action. *See Kar-*
*pus v. Borelli (In re Interpublics Secs. Litig.),* 2004 WL 2397190, at *9, 2004 U.S. Dist. LEXIS 21429, at *26 (S.D.N.Y. Oct. 26, 2004) (approving derivative class action settlement and noting that plaintiff's claims were "perilously weak," including his assertion that he had standing to bring a claim under Section 304); *In re Cree, Inc. Secs. Litig.,* 333 F.Supp.2d 461, 478 (M.D.N.C.2004) (granting leave to amend a complaint and explicitly deferring the question of whether Section 304 can be enforced through a private cause of action); *In re AFC Enters., Inc. Derivative Litig.,* 224 F.R.D. 515 (N.D.Ga.2004) (denying motion to dismiss in diversity case without discussing whether shareholders who raised a Section 304 claim had a right to do so).

In *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court crafted a four-part test to determine "whether a private remedy is implicit in a statute not expressly providing one." The *Cort* test asks four questions:

First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to

---

7. The Act's general enforcement provision states:

A violation by any person of this Act, any rule or regulation of the Commission issued under this Act, or any rule of the Board shall be treated for all purposes in the same manner as a violation of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) or the rules and regulations issued thereunder, consistent with the provisions of this Act, and any such person shall be subject to

the same penalties, and to the same extent, as for a violation of that Act or such rules or regulations.

15 U.S.C. § 7202(b)(1). As discussed in detail below, Congress chose to treat enforcement rights differently throughout the Act. Therefore, we cannot rely on this general provision to answer the specific question of what Congress intended regarding Section 304's enforcement.

state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

422 U.S. at 78, 95 S.Ct. 2080 (citations omitted).

Since *Cort,* the Supreme Court has explained that the "central inquiry" of the test is "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). Even if a court believes that an implied remedy is "necessary to make effective the congressional purpose expressed by a statute," it cannot imply a remedy based on this consideration. *Alexander v. Sandoval,* 532 U.S. 275, 287, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (quoting *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964)). Regardless of whether implying a private right of action effectuates the purposes of a statute, "what must ultimately be determined is whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Moreover, we need not "trudge through all four of the factors when the dispositive question of legislative intent has been resolved." *Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (quoting *Cal. v. Sierra Club,* 451 U.S. 287, 302, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring)).

 When assessing whether Congress intended to create a private right of action, our Court of Appeals has cautioned that "a court may find such a right implied only where it can *confidently conclude* Congress so intended." *Dep't of Envtl. Protection & Energy v. Long Island Power Auth.,* 30 F.3d 403, 421 (3d Cir.1994) (emphasis added). Finding a private right of

action under a lesser standard might "alter the remedial scheme devised by Congress for the enforcement of statutory programs and ... place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.' " *Id.* (quoting *American Tel. & Tel. Co. v. M/V Cape Fear,* 967 F.2d 864, 866 (3d Cir.1992)).

Guided by this jurisprudence, we examine whether Congress intended to create a private right of action by looking first to the text and structure of the Act. *See Alexander,* 532 U.S. at 288, 121 S.Ct. 1511.

Despite the absence of specific language conferring upon private parties a cause of action, plaintiff argues that in two ways Section 304's plain language demonstrates Congress' intent to grant such a right. First, he contends that Congress, by creating a reimbursement benefit for issuers like Stonepath, intended for private plaintiffs to enforce that right in court. Defendants argue that plaintiff is not a member of a benefited class because disgorgement is not a remedy designed to protect a class, but instead is designed to punish wrongdoers.

Congress created a federal right in favor of issuers by specifying they would receive the proceeds of officers' benefits, but at the same time Congress selected a remedy—disgorgement—which "is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir.1997) (quoting *SEC v. First City Fin. Corp.,* 281 U.S.App. D.C. 410, 890 F.2d 1215, 1230 (D.C.Cir.1989)). Although Congress created a remedy that would indirectly benefit Stonepath shareholders, "whether Congress intended additionally that [this] provision[ ] would be enforced through private litigation is a different question." *Transamerica,* 444 U.S. at 18,

100 S.Ct. 242; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002) ("[E]ven where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'") (quoting *Alexander*, 532 U.S. at 286, 121 S.Ct. 1511).

In a second textual argument, plaintiff points to subsection (b), which allows the SEC to exempt a CEO or CFO from disgorgement when it deems such an exemption to be "necessary and appropriate." Plaintiff contends this subsection would be unnecessary unless Congress had contemplated someone other than the SEC initiating the action. This argument assumes that after a private party brings suit, the SEC would make an exemption assessment.

At least two factors weigh against plaintiff's interpretation. First, subsection (b) can be read as giving the SEC discretion to consider factors—such as the type of misconduct or the persons involved—when deciding whether it should exempt some-one from an SEC disgorgement action. Such an exemption determination would not require as a predicate the involvement of any private litigant. Second, Congress provided no guidance for private parties or the SEC as to what form SEC exemption determinations would take, or even whether such determinations would be mandatory. Given these problems, we do not see why subsection (b) must be read to require a implied private right of action.

Since the text of Section 304 does not resolve the issue, we turn to examine the Act as a whole to see how Congress addressed private rights of action. Congress explicitly created a private right of action in only one place, and that is in Section 306. This section makes it unlawful for directors or executive officers to buy or sell any of the issuer's equity securities during a pension fund blackout period if such securities were acquired in connection with the director or executive officer's employment.[8] 15 U.S.C. § 7244. If the issuer fails to bring an action to recover profits within sixty days of a request to do so, "[a]n action ... [under] this subsection may be instituted ... by the owner of any

---

8. Section 306 provides, in relevant part:
(a) Prohibition of insider trading during pension fund blackout periods.
(1) In general.
Except to the extent otherwise provided by rule of the Commission pursuant to paragraph (3), it shall be unlawful for any director or executive officer of an issuer of any equity security (other than an exempted security), directly or indirectly, to purchase, sell, or otherwise acquire or transfer any equity security of the issuer (other than an exempted security) during any blackout period with respect to such equity security if such director or officer acquires such equity security in connection with his or her service or employment as a director or executive officer.
(2) Remedy.
(A) In general.
Any profit realized by a director or executive officer referred to in paragraph (1) from any purchase, sale, or other acquisition or transfer in violation of this subsection shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such director or executive officer in entering into the transaction.
(B) Actions to recover profits.
An action to recover profits in accordance with this subsection may be instituted at law or in equity in any court of competent jurisdiction *by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer* if the issuer fails or refuses to bring such action within 60 days after the date of request, or fails diligently to prosecute the action thereafter, except that no such suit shall be brought more than 2 years after the date on which such profit was realized.
15 U.S.C. § 7244 (emphasis added).

security of the issuer in the name and in behalf of the issuer." 15 U.S.C. § 7244(a)(2)(B). No suit can be brought more than two years after the profit was realized. *Id.*

The contrast between Sections 304 and 306 is apparent. Both address wrongdoing of officers and both provide for the issuer's reimbursement, yet only Section 306 expressly creates a private remedy, and one with a statute of limitations. Section 306 shows that "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross*, 442 U.S. at 572, 99 S.Ct. 2479 (deciding not to imply private remedy when provision silent on the matter was flanked by provisions explicitly providing for private causes of action). Because Congress explicitly created a private right of action in Section 306 and did not do so in Section 304, the natural inference is that Congress did not intend to create a private right of action in Section 304. *Expressio unius est exclusio alterius.*

Two other provisions in the Act demonstrate the care and precision Congress gave to affording remedies and identifying enforcers. Section 303 makes it unlawful for officers or directors to "fraudulently influence, coerce, manipulate, or mislead" independent auditors, and that Section provides that "[i]n any civil proceeding, the Commission shall have exclusive authority to enforce this section." 15 U.S.C. § 7242(a), (b). Section 804, which extends the statute of limitations for claims in particular securities fraud cases, states that "[n]othing in this section shall create a new, private right of action." 28 U.S.C. § 1658(c).

To sum up, Sections 303 and 804 do not grant private parties a new cause of action, Section 306 specifically grants one, and Section 304 is silent on the matter. Notably, Sections 304 and 306 share an important characteristic in that each provides for issuers to be reimbursed with wrongdoing officers' profits, a subject neither Section 303 nor 804 addresses.[9] Given the similarity of Sections 304 and 306, a comparison of these two sections' enforcement language is more telling than comparisons with Sections 303 and 804. Congress was at pains in Section 306(a)(2)(B) to spell out who could enforce that section and how long the enforcer had to do it. Since Section 304 is silent on both subjects, it is fair to say that implying a private right would, at least in this context, require us to rewrite Congress's statute. This we cannot do.

As neither the text nor the Act's structure demonstrates that Congress intended to create a private remedy, we consider, as the jurisprudence may still require, legislative history.[10] The Conference Report submitted with the Act does not discuss

---

**9.** It will be recalled that Section 303 does not expressly create a right benefiting issuers, and Section 804 merely extends a statute of limitations.

**10.** We are unsure whether such an inquiry survives *Alexander v. Sandoval. Compare* Justice Stevens's dissent (stating that "the Court today adopts a methodology that blinds itself to important evidence of congressional intent"), 532 U.S. at 313, 121 S.Ct. 1511 (Stevens, J., dissenting op.), *with* Justice Scalia's opinion for the Majority (responding to Justice Stevens's criticism and asserting that un-

der well-established methodology interpretive inquiries begin and end with a statute's text and structure when these do not make clear that Congress intended to create a cause of action), *id.* at 289 n. 7, 121 S.Ct. 1511. In any event, we entirely share Justice Scalia's oft-expressed skepticism about such an enterprise. *See, e.g., Conroy v. Aniskoff,* 507 U.S. 511, 519, 113 S.Ct. 1562, 123 L.Ed.2d 229 (1993) (Scalia, J. concurring) (describing "the use of legislative history as the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.").

who can bring a claim under Section 304, *see* H.R.Rep. No. 107–610 (2002) (Conf. Rep.), but Committee Reports submitted with earlier drafts of the Act specifically mention enforcers. On April 22, 2002, the Committee on Financial Services reported out a draft to the House of Representatives.[11] This draft required the Commission to analyze whether any officer or director should be required to disgorge funds during the six months preceding the filing of a restatement, and then prescribe a disgorgement rule if "necessary and appropriate." The issuers would receive any disgorged profits, and enforcement of the rule would "lie solely with the Commission." H.R. Rpt. No. 107–414, at 12 (2002).

A vocal minority of Representatives criticized this section for failing faithfully to implement President Bush's post-Enron ten-point plan to restore accountability among corporate officers. The plan called for the disgorgement of incentive-based

compensation from officers and directors who made false or misleading statements requiring a restatement. Critics of the House draft were troubled that the draft provision was ineffectual.

Instead of attempting to implement [President Bush's] straightforward and common sense proposal, the Committee simply tasked the SEC to study the question of disgorgement. Additionally, the report language attempts to raise the bar to use of this remedy by stating that it should be used only where *the Commission can prove* "extreme misconduct". Establishing such a high standard will make it very difficult, if not impossible, for *the Commission to obtain disgorgement* of millions of dollars that executives have earned from stock sales at the same time they were committing securities fraud.

We, however, believe that Congress should act quickly to *provide the SEC with the power to require disgorgement*

---

11. This draft was called the Corporate and Auditing Accountability, Responsibility, and Transparency Act of 2002, and states, in relevant part:

SEC. 12. DISGORGING INSIDERS [sic] PROFITS FROM TRADES PRIOR TO CORRECTION OF ERRONEOUS FINANCIAL STATEMENTS.
(a) ANALYSIS REQUIRED.—The Commission shall conduct an analysis of whether, and under what conditions, any officer or director of an issuer should be required to disgorge profits gained, or losses avoided, in the sale of the securities of such issuer during the six month period immediately preceding the filing of a restated financial statement on the part of such issuer.
(b) DISGORGEMENT RULES AUTHORIZED.—If the Commission determines that imposing the requirement described in subsection (a) is necessary or appropriate in the public interest or for the protection [of] investors, and would not unduly impair the operations of issuers or the orderly operation of the securities markets, the Commission shall prescribe a rule requiring the disgorgement of all profits gained or losses avoided in the sale of

the securities of the issuer by any officer or director thereof. Such rule shall—
(1) describe the conditions under which any officer or director shall be required to disgorge profits, including what constitutes a restatement for purposes of operation of the rule;

(2) establish exceptions and exemptions from such rule as necessary to carry out the purposes of this section;

(3) identify the scienter requirement that should be used in order to determine to impose the requirement to disgorge; and

(4) specify that the enforcement of such rule shall lie solely with the Commission, and that any profits so disgorged shall inure to the issuer.
(c) NO PREEMPTION OF OTHER LAW.—Unless otherwise specified by the Commission, in the case of any rule promulgated pursuant to subsection (b), such rule shall be in addition to, and shall not supersede or preempt, the Commission's authority to seek disgorgement under any other provision of law.
H.R.Rep. No. 107–414, at 12 (2002).

of compensation in an administrative proceeding. . . .

In addition, the bill should have included a provision that provides in *any action or proceeding brought or instituted by the Commission* under the securities laws against any person who made or caused to be made the filing of financial statements that were at the time false or misleading . . . may be required to disgorge salaries, commissions, fees, bonuses and other incentive-based compensation.

H.R. Rpt. No. 107–414, at 50–51 (Minority Views) (emphasis added).

The majority wanted the SEC to analyze whether disgorgement would be wise and, if it did, to prescribe a rule. A minority wanted Congress to immediately empower the SEC to seek disgorgement. Yet one point is clear: neither supporters nor opponents of the House draft wanted to give private parties the right to seek disgorgement under this provision. The House Report thus reflects a consensus that the SEC alone would have the right to seek disgorgement.

On July 3, 2002, the Senate Committee on Banking, Housing, and Urban Affairs reported on and recommended passage of its draft, entitled the Public Company Accounting Reform and Investor Protection Act of 2002. *See* S. Rpt. 107–205 (2002). Like the House, the Senate pointed to the President's plan when explaining the need for a disgorgement provision pertaining to restatements.

The President has recommended that 'CEOs or other officers should not be allowed to profit from erroneous financial statements,' and that 'CEO bonuses and other incentive-based forms of compensation [sh]ould be disgorged in cases of accounting restatement and misconduct.'

Title III includes provisions designed to prevent CEOs or CFOs from making large profits by selling company stock, or receiving company bonuses, while management is misleading the public and regulators about the poor health of the company.

*Id.* at 26.

The Senate Report does not discuss who should enforce this. The text the Senate proposed, however, and which Congress eventually adopted as Section 304 of the Act, directly responded to the criticisms voiced in the House. The Senate made disgorgement immediately available without requiring the SEC to analyze the matter before prescribing a rule. At the same time, it permitted the SEC some discretion by allowing for exemptions.

The legislative history thus reveals that Representatives in the House agreed that the SEC would bring disgorgement actions. Two and a half months after expressing this House understanding, the Senate submitted language that empowered the SEC to seek immediate disgorgement. If the intent had been to create a new private right of action, we would expect to see *some* comment to that effect in one or both of the Committee Reports. There is none.

Thus, we are left with the core reality that Congress expressly granted a private right of action in Section 306, a provision sharing important features with Section 304, yet elected not do so in Section 304. We will not disturb that election.

*Conclusion*

In light of the text and structure of the Act and its legislative history, we find that Congress did not intend to create an implied cause of action in Section 304 of SarbOx. Having found that plaintiff does not present a federal claim, we do not reach defendants' other grounds for dismissal.

Furthermore, absent a federal claim under SarbOx, we believe the Delaware state courts are far better suited than we are to consider plaintiff's remaining state law based claims. We therefore elect not to exercise our supplemental jurisdiction over them.

Accordingly, we dismiss plaintiff's complaint without prejudice. An appropriate order follows.

### *ORDER*

AND NOW, this 27th day of September, 2005, upon consideration of defendants' second motion to dismiss plaintiff's amended shareholder derivative complaint (docket entry # 30), plaintiff's memorandum of law in opposition to defendants' motion (docket entry # 31), defendants' reply memorandum in support of defendants' motion (docket entry # 33), and plaintiff's motion to compel a Rule 26(f) conference of parties (docket entry # 37), and in accordance with the accompanying memorandum, it is hereby ORDERED that:

1. Defendants' motion is GRANTED;

2. Plaintiff's motion is DENIED AS MOOT;

3. Count I of the Amended Complaint is DISMISSED, and Counts II—VI are DISMISSED WITHOUT PREJUDICE pursuant to 28 U.S.C. § 1367(c); and

4. The Clerk shall CLOSE this case statistically.