### In re IBASIS, INC. DERIVATIVE LITIGATION

**This Document Relates to All Actions.**

**No. 06–12276–DPW.**

United States District Court,
D. Massachusetts.

Dec. 4, 2007.

Jeffrey P. Fink, Robbins Umeda & Fink, LLP, San Diego, CA, Terence K. Ankner, Peter C. Horstmann, The Law Offices of Partridge, Ankner & Horst-

mann, LLP, Boston, MA, for David Shutvet and Victor Malozi.

John Sylvia, Allison W. Phinney, III, Joseph P. Messina, Marguerite Elizabeth Gomperz, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA, for Ofer Gneezy, Gordon J. Vanderbrug, Richard G. Tennant, Charles Corfield, Charles M. Skibo, W. Frank King, David Lee, Robert H. Brumley, Daniel Price, John G. Henson, Jr., Michael J. Hughes, Charles Giambalvo, John Jarve, Charles M. Houser, Carl Redfield, Ibasis, Inc., and Paul H. Floyd.

Jonathan A. Shapiro, Sharon C. Simpson Jones, Timothy J. Perla, Wilmerhale LLP, Boston, MA, for Jonathan D. Draluck.

### MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, District Judge.

At issue in this litigation are allegations of grant date manipulation in the award of stock options to current and former directors and employees of iBasis, Inc. ("iBasis" or the "Company"). David Shutvet and Victor Malozi (the "Plaintiffs") are shareholders of iBasis. Each filed a shareholder derivative action on behalf of the Company, and the actions were consolidated into a case against twenty of the Company's current and former directors and officers (the "Defendants"). The Plaintiffs allege violations of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Section 304 of the Sarbanes–Oxley Act of 2002 ("SOX") and raise state law claims including unjust enrichment, breaches of fiduciary duty, and waste of corporate assets. The Defendants have filed motions to dismiss,[1] and for reasons I discuss below, I find that the Plaintiffs fail adequately to assert viable federal claims. Given the nascent stage of this litigation, I will decline to exercise my supplemental jurisdiction over the remaining state law claims. Accordingly, I will dismiss all of the claims in this case.

### I. Background

#### A. Stock Option Grant Date Manipulation

This litigation is part of a growing number of shareholder derivative suits focused on manipulation of the timing of stock option grants. On March 18, 2006, *The Wall Street Journal* published the article, "The Perfect Payday: Some CEOs reap millions by landing stock options when they are most valuable. Luck—or something else?" (Compl.¶ 58.) Since the article's publication, a number of companies have disclosed director and officer involvement in stock option grant manipulation.

In September 2006, iBasis announced an internal investigation of its previous options grant practices. (Compl.¶ 9.) The investigation led to the discovery that "the appropriate measurement dates for determining the accounting treatment of certain stock option grants differ from the measurement dates used by the Company in preparing its financial statements." (Compl.¶ 9.) In October, the Company announced that the SEC had initiated its own investigation into the matter. (Compl.¶ 79.) Ultimately, the Company issued an accounting restatement on June 12, 2007 that totaled $10 million. (Compl.¶ 9.) The restatement revealed that

---

1. Of the twenty defendants identified in the verified consolidated shareholder derivative complaint ("Complaint"), seventeen have filed a joint motion to dismiss and will be referred to as "iBasis Defendants". One defendant, Jonathan Draluck, who is only implicated in the state law claims, has filed a separate motion to dismiss. (Docket Nos. 36, 39.) The remaining two defendants had not been served when the motions to dismiss were filed.

the Company had uncovered e-mail messages either sent to or from Jonathan Draluck ("Draluck"), the General Counsel at the time, indicating that the option grant dates were likely determined in hindsight. (Compl.¶ 80.)

### B. 1997 Stock Incentive Plan and Stock Option Grant Manipulation

The granting of iBasis stock options at times relevant to the Complaint was controlled by the Company's Amended and Restated 1997 Stock Incentive Plan ("1997 Plan"). (Compl.¶ 44.) The 1997 Plan gave the Compensation Committee authority to grant stock options pursuant to the terms of the 1997 Plan. (Compl.¶ 46.) The terms required that "the purchase price under an Incentive Stock Option [awardable only to employees] shall not be less than 100% of the Fair Market Value of the Common Stock on the date of grant of such Option." [2] (Compl.¶ 45.) The Fair Market Value of the Common Stock was determined based on the last reported NASDAQ price. (Compl.¶ 45.)

The Plaintiffs have identified six dates when alleged stock option grant date manipulation took place: May 25, 2000; April 4, 2001; June 20, 2001; November 15, 2001; November 19, 2001; and September 14, 2004. (Compl.¶ 50.) Plaintiffs claim the first five dates involved stock option backdating and the last date involved stock option spring-loading. (Compl.¶¶ 70, 74) [3]

Using an algorithm based upon the work of an options backdating expert, the Plaintiffs assert that there is only a .024 percent probability that the five backdated grants would have occurred randomly. (Compl.¶ 72.) Specifically, Plaintiffs allege:

- The May 25, 2000 option grant was priced at the lowest share price for the 14 month period of November 10, 1999 through September 29, 2000. Plaintiffs allege that Ofer Gneezy was granted 13,333 stock options; Michael Hughes was granted 8,333; John Henson, Jr. was granted 8,333; and Gordon VanderBrug was granted 10,000.

- The April 4, 2001 option grant was priced at the lowest share price for the 22 month period of November 10, 1999 through July 30, 2001. Plaintiffs allege that Dan Powdermaker was granted 41,667 stock options.

- The June 20, 2001 option grant was priced at the lowest share price for the three month period of April 20, 2001 through July 20, 2001. Plaintiffs allege that W. Frank King was granted 26,667 stock options.

- The November 15, 2001 option grant was priced within $0.24 per share of the lowest share price for the seven month period of November 19, 2001 through February 5, 2002. Plaintiffs allege that Charles Corfield was granted 13,333 stock options; Charles Gi-

---

**2.** Incentive Stock Options could only be granted to employees of iBasis. Decl. of A.W. Phinney Esq. in Supp. of the iBasis Defendants' Mot. to Dismiss ("Phinney Decl.") Ex. D § 6(d). Non-employees were eligible to receive Nonqualified Stock Options, which were not subject to the purchase price requirements of the Incentive Stock Option. Phinney Decl. Ex. D §§ 6(a), 6(d).

**3.** Stock option grant date manipulation can occur by backdating or spring-loading the options. Backdating involves issuing stock op-

tions on one date but providing documentation indicating that the options were actually issued on an earlier date, generally when the stock option grant price was lower. *Ryan v. Gifford*, 918 A.2d 341, 345 (Del.Ch.2007) (Chandler, C.). Spring-loading options involves issuing option grants prior to the public announcement of positive news, thus allowing the owner of the stock option to take advantage of the increase in share price from the good news. (Compl.¶ 7.)

ambalvo was granted 15,000; W. Frank King was granted 16,667; Dan Powdermaker was granted 10,000; Charles Skibo was granted 13,333; Gordon VanderBrug was granted 16,-667; Paul Floyd was granted 20,000; Ofer Gneezy was granted 16,667; Sean O'Leary was granted 11,666; Carl Redfield was granted 13,333; and Richard Tennant was granted 50,000.

- The November 19, 2001 option grant was priced within $0.06 per share of the lowest share price for the three month period of November 19, 2001 through February 5, 2002. Plaintiffs allege that Charles Skibo was granted 16,667 stock options.

- The September 14, 2004 option grant was dated on the day before iBasis announced the launch of its Pingo service, which precipitated a 10% increase in the Company's stock price over the next four weeks. Plaintiffs allege Ofer Gneezy, Paul Floyd, Dan Powdermaker, Charles Tennant, and Gordon VanderBrug received a total of 66,665 of these stock options.

(Compl.¶¶ 67, 74, 100.)

## C. The Defendants

Twenty former and existing iBasis employees and directors are named as defendants:

Ofer Gneezy ("Gneezy") has been the Company's President, Chief Executive Officer ("CEO"), Treasurer and a director since August 1996. (Compl.¶ 16.) He served on the Compensation Committee from 1999 to 2005. *Id.* Plaintiffs allege, on information and belief, that Gneezy received backdated stock options as well as spring-loaded options. *Id.*

Gordon VanderBrug ("VanderBrug") has been the Company's Executive Vice President, Assistant Secretary, and a director since October 1996. (Compl.¶ 17.)

On information and belief, the Plaintiffs allege that VanderBrug received backdated stock options as well as spring-loaded options. *Id.*

Dan Powdermaker ("Powdermaker") has been one of the Company's Senior Vice Presidents since June 2002. Before that, he served as a Vice President from 1998 to 2000 and the Director of Carrier Sales from 1997 to 1998. (Compl.¶ 18.) The Plaintiffs allege, on information and belief, that Powerdermaker received backdated and spring-loaded stock options. *Id.*

Richard G. Tennant ("Tennant") has been the Company's Chief Financial Officer ("CFO") since October 2001. (Compl.¶ 19.) He has also been a Senior Vice President since February 2006 and held various other employee positions since October 2001. *Id.* The Plaintiffs allege, on information and belief, that Tennant received both backdated and spring-loaded stock options. *Id.*

Paul Floyd ("Floyd") has been a Senior Vice President at the Company since September 2001 and also served as a Vice President for five months before then. (Compl.¶ 20.) The Plaintiffs allege, on information and belief, that Floyd received backdated and spring-loaded stock options. *Id.*

Charles Skibo ("Skibo")has been a Company director since September 1999. (Compl.¶ 21.) In addition, he was a member of the Compensation Committee from 1999 to 2000 and resumed that role again starting in 2001 until the present. *Id.* The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

W. Frank King ("King") has been a Company director since June 2001 and a member of the Audit Committee since 2002. (Compl.¶ 22.) The Plaintiffs allege,

on information and belief, that King received backdated stock options. *Id.*

Charles Corfield ("Corfield") has been a Company director since September 1997 and a member of the Audit Committee since 1999. (Compl.¶ 23.) Corfield has also been a member of the Compensation Committee since 2002. *Id.* The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

David Lee ("Lee") has been a Company director since May 2002 and a member of the Audit Committee since 2003. (Compl.¶ 24.) The Plaintiffs do not allege that Lee received any backdated or spring-loaded stock options. *Id.*

Robert Brumley ("Brumley") has been a Company director since September 2005. (Compl.¶ 25.) The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Daniel Price ("Price") served as a Senior Vice President and as a Company director from February 2001 until about August 2001. (Compl.¶ 26.) The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Charles Giambalvo ("Giambalvo") served as a Company Senior Vice President from January 2000 until sometime in 2001. (Compl.¶ 27.) The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

Sean O'Leary ("O'Leary") served as a Company Senior Vice President from August 2002 to August 2003. (Compl.¶ 28.) The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

John Henson, Jr. ("Henson") served as a Company Vice President from 1998 to November 2000. (Compl.¶ 29.) The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

Michael Hughes ("Hughes") served as the Company's CFO and as a Vice President from August 1998 through 2001. (Compl.¶ 30.) The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

Jonathan Draluck ("Draluck") served as a Company Vice President, General Counsel, and Secretary from about January 2001 to about October 2006. (Compl.¶ 31.) The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Carl Redfield ("Redfield") was a Company director from September 1999 to July 2002. (Compl.¶ 32.) The Plaintiffs allege, on information and belief, that he received backdated stock options. *Id.*

John Jarve ("Jarve") was a Company director from August 1998 to May 2001. (Compl.¶ 33.) He also served on the Compensation Committee from 1999 to May 2001 and the Audit Committee in 2001. *Id.* The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Charles Houser ("Houser") served as a Company director from October 1997 to about February 2001 and as a member of the Audit Committee in 1999. (Compl.¶ 34.) The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Peter Aquino ("Aquino") served as a Company director from August 2004 to September 2005. (Compl.¶ 35.) The Plaintiffs do not allege that he received any backdated or spring-loaded stock options. *Id.*

Gneezy, VanderBrug, Skibo, King, Corfield, Lee, Brumley, Redfield, Jarve, Houser, and Aquino are the "Director Defendants". Of this group, Gneezy, VanderBrug, Skibo, King, Corfield, Lee, and Brumley were the seven Company di-

rectors at the time the Complaint was filed ("Directors"). (Compl.¶ 97.) Among the Directors, Gneezy, Skibo and Corfield were members of the Compensation Committee at the time of the allegedly manipulated stock option grants. (Compl.¶ 100.) Corfield was a member of the Audit Committee during the first three option grants. (Compl.¶ 101.) Corfield and King were both members of the Audit Committee when the November 15th and 19th stock options were granted. (Compl.¶ 101.) They were also members of the Audit Committee along with Lee when the September 14, 2004 option grant occurred. (Compl.¶ 101.) In addition, the Plaintiffs allege that Gneezy, VanderBrug, Corfield, Skibo and King received manipulated stock option grants. (Compl.¶ 98.)

### D. Procedural History

David Shutvet and Victor Malozi separately filed essentially identical actions initiating this litigation on December 21, 2006. (Docket No. 1.) I granted the motion to consolidate the cases on May 1, 2007. A Consolidated Complaint against the current twenty defendants was filed on June 15, 2007. (Docket No. 33) The case is now before me on two motions to dismiss—one jointly filed motion by the several iBasis Defendants and one individually filed motion by Draluck. (Docket Nos. 36, 39.)

---

4. The Defendants submit records that indicate iBasis never issued a proxy statement on January 31, 2000. (*See* Phinney Decl. ¶ 7, Ex. F.) I am allowed to consider these official public records in a motion to dismiss even though they were not included in the Complaint. *Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993) (Campbell, J.). The Plaintiffs failed to explain the date discrepancy in their Opposition. When the issue was raised at the motion to dismiss hearing, Plaintiffs' counsel was unprepared to address the issue. Noting that iBasis did issue a proxy statement on January

## II. Discussion

### A. Standard of Review

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted is evaluated by "taking as true the well-pleaded facts contained in the complaint and drawing all reasonable inferences therefrom in the plaintiff's favor." *Phoung Luc v. Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir.2007) (quoting *Garrett v. Tandy Corp.*, 295 F.3d 94, 97 (1st Cir.2002)). The Supreme Court recently addressed this standard in *Bell Atlantic Corp. v. Twombly* noting that the claims raised must be more than simply conceivable—they must be plausible. —— U.S. ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). The First Circuit in response has observed that "even under the liberal pleading standard of Federal Rule of Civil Procedure 8", the *Bell Atlantic* standard requires that a complaint "allege a plausible entitlement to relief." *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir.2007).

### B. Section 14(a) of the Exchange Act

The Plaintiffs seek to allege that iBasis made false and misleading statements to its shareholders in its January 31, 2000 [4] and April 13, 2005 proxy statements (the "Proxies"). (Compl.¶ 119.) In Count I, the Plaintiffs claim the Director Defendants violated Section 14(a) of the Exchange Act by allowing the Company to issue the Proxies.[5] (Compl.¶ 119.) The

---

31, 2001 (Phinney Decl. Ex. F.), I indicated I would treat the allegation in the Consolidated Complaint as referring to the January 2001 proxy. As will appear, this difference in dates does not, in any event, change the outcome of the time bar analysis.

5. Section 14(a) of the Exchange Act states:

(a) It shall be unlawful for any person ... in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public inter-

Defendants raise three arguments against the Section 14(a) claim: 1) it is time barred; 2) the Consolidated Complaint fails to show a causal link between the Proxies and any harm suffered by the Plaintiffs; and 3) the Consolidated Complaint fails to meet the PSLRA pleading requirements. The first and second arguments combined are sufficient to cause dismissal of the claims. Accordingly, I will dismiss the Plaintiffs' Section 14(a) claim without addressing the third argument.

### 1. The Limitations and Repose Time Bars of Section 14(a)

The Section 14(a) claim can only proceed if it is brought within the relevant limitations period. The courts have recognized for Section 14(a) claims that related and similar causes of action under the Exchange Act have effectively supplied "a limitations period of 'one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.'" *Westinghouse Elec. Corp. v. Franklin,* 993 F.2d 349, 353 (3d Cir.1993) (quoting *In re Data Access Systems Sec. Litig.,* 843 F.2d 1537, 1550 (3d Cir.1988)) (*superceded in part by statute* [6] *as stated in In re Exxon Mobil Corp. Sec. Litig.,* 500 F.3d 189, 198 (3d Cir.2007)).

The one-year limitations period functions as a statute of limitations and the three-year limitations period functions as a statute of repose. The Supreme Court has recognized this distinction, noting that because "the purpose of the three-year limitation is clearly to serve as a cutoff, ... tolling principles do not apply to that period." *Lampf, Pleva, Lipkind, et al. v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The Plaintiffs first filed Complaints on December 21, 2006 (Docket No. 1) consequently any proxy statements filed prior to December 21, 2003 (or December 21, 2001, if the extended SOX time period were to apply, *see* Note 6, *supra* ) would be barred by the statute of repose.

Plaintiffs rely on a line of cases dealing with fraudulent schemes alleged to violate other provisions of the Exchange Act for the proposition that their three-year stat-

---

est or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78 of this title.
15 U.S.C. § 78n
Regulation 14A states:
(a) No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.
17 C.F.R. § 240.14a–9.

6. The Sarbanes–Oxley Act,("SOX"), enacted on July 30, 2002, includes a more specific limitations provision for a private right of action involving fraud. This provision requires the action to be brought within two years of discovery of the violation or five years after the occurrence of such violation, whichever occurs first. 28 U.S.C. § 1658(b). Courts have found that the SOX limitations provision does not extend the one-year statute of limitations and three-year statute of repose previously recognized for Section 14(a) claims, because a Section 14(a) violation does not require fraud as an essential element. *In re Exxon Mobil Corp. Sec. Litig.,* 500 F.3d 189, 196–197 (3d Cir.2007); *In re Zoran Corp. Derivative Litig.,* 511 F.Supp.2d. 986, 1016–1017 (N.D.Cal.2007). As will appear, even if the SOX statute were to be construed to include Section 14(a), there was no actionable violation here within the extended five-year period.

ute of repose did not start until March 23, 2006 when the last materially false proxy statement was filed. These cases hold that "the statute of repose runs from the date of the last fraudulent misrepresentation". *Quaak v. Dexia, S.A.,* 357 F.Supp.2d 330, 338 (D.Mass.2005) (Saris, J.). But the cases relied on by the Plaintiffs not only assert non-Section 14(a) claims, they involve ongoing and continuing fraudulent schemes that relate to the very core of each company's business. *See In re Stone & Webster, Inc. Sec. Litig.,* Civil Action No. 00–10874–RWZ, 2006 WL 1738348, at *1 (D. Mass. June 23, 2006) (Zobel, J.) (alleging that an engineering firm violated Sections 10(b) and 18 because it "deliberately underbid" on contracts in order to overstate earnings, "fraudulently concealed" its loss on a large contract, and misrepresented the likelihood of bankruptcy); *In re Dynex Capital, Inc. Sec. Litig.,* No. 05 Civ. 1897(HB), 2006 WL 314524, at *1 (S.D.N.Y. Feb.10, 2006) (Baer, J.) (alleging that a financial services corporation that issued debt securities using mortgages as collateral violated Sections 10(b) and 20(a) by purchasing large volumes of "bad paper" without disclosing the quality of the mortgages in its public offerings); *Quaak,* 357 F.Supp.2d at 332 (alleging that a company violated Section 10(b) by creating and providing funding to sham holding companies in order to help increase the generation of fictitious licensing revenue). These cases "involved continuous, integrated schemes that were operated by the same group of people over a period of time to achieve the same purposes." *In re Zoran,* 511 F.Supp.2d at 1014 (N.D.Cal.2007).

Recent cases addressing allegations of stock option grant date manipulation under Section 14(a) have disavowed the broad fraudulent scheme approach and instead required that the initial misstatement regarding option dating fall within the statute of repose period. *See, e.g.,*

*Stoll v. Ardizzone,* No. 07 Civ. 00608(CM), 2007 WL 2982250, at *2 (S.D.N.Y. Oct.9, 2007) ("Pleading the existence of a 'scheme' does not resurrect stale claims relating to proxy statements that are more than three years old at the time an action is filed; there is no 'continuing violations' exception to the absolute bar of the statutory limitations period.' "); *In re Zoran,* 511 F.Supp.2d at 1014 (holding that "the statute of limitations accrues as of when the violation itself occurs, not when the last violation in a series of alleged violations occur").

■ The Plaintiffs have failed to provide any sort of link between the January 31, 2001 and April 13, 2005 Proxies. Even if the Defendants were engaged in a broad fraudulent scheme of granting manipulated stock options, the Plaintiffs have failed to allege that the Proxies are connected together in this scheme. Thus, despite the presumptive difficulties in discovering backdated stock options, I find that the statute of repose for Section 14(a) claims applies to each individual proxy statement. The statute of repose bars the Plaintiffs from raising a Section 14(a) claim based on proxy statements issued prior to December 21, 2003 (or December 21, 2001 if the SOX statute of repose applies). Consequently, claims based on the January 31, 2001 proxy are time barred.

## 2. Causation

■ As to the April 13, 2005 proxy statement, the Plaintiffs have failed to show a causal nexus between any alleged injury to iBasis and the transactions approved in the Proxies. The First Circuit has noted that Section 14(a) claims require "transactional causation" connecting a company's alleged injury with the "corporate transaction authorized (or defeated) as a result of the allegedly false and mis-

leading proxy statements." *Royal Bus. Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1063 (1st Cir.1991). The Complaint states: "The January 31, 200[1] and April 13, 2005 proxies each contained proposals to iBasis' shareholders that they vote to approve increases in the number of shares and options awardable under the 1997 Plan." (Compl.¶ 119.) I observe that, while not specifically pled, the April 13, 2005 proxy statement concerned reelection of three directors alleged earlier to have engaged in stock grant timing manipulation. The Complaint further alleges that "[t]his information would have been material to iBasis' shareholders in determining whether or not to approve amendments to the 1997 Plan contained in the Proxies." (Compl.¶ 121.)

These allegations fail to create the required causal connection. As discussed above, any proxy statement before December 21, 2003 (or, perhaps, December 21, 2001) is time-barred. Thus, the Plaintiffs can only proceed with a Section 14(a) violation claim based on the April 13, 2005 proxy statement, the only other proxy statement mentioned in the Complaint. The Complaint identifies six potential manipulated options grant dates between May 25, 2000 and September 14, 2004. (Compl.¶ 50.) All of these dates pre-date the April 13, 2005 proxy statement. No backdated or spring-loaded stock options are alleged to have been issued after April 13, 2005.

The Plaintiffs rely on *Zoran* for support that they have adequately alleged harm caused by the April 13, 2005 proxy statement. The *Zoran* court held that the plaintiffs had adequately alleged causation by pleading:

[T]he directors used the proxy solicitations to maintain their positions on Zoran's board. Shareholders allegedly kept voting for the board members in blissful ignorance of the scheme to grant insiders backdated options while shortchanging the company. Shareholders also authorized the stock-option plans under which the allegedly-backdated options were granted. With each election, the board could continue to grant backdated stock options to itself and Zoran executives. Zoran was damaged because defendants caused it to divert company assets to recipients of backdated stock options. Zoran was also exposed to an inquiry by the SEC as a result and has allegedly suffered damage to its reputation and investor confidence. Had shareholders known that defendants had not followed the dictates of the plan in the past, this likely would have changed their votes.

*Zoran*, 511 F.Supp.2d at 1016. The Plaintiffs argue that a similar situation exists here, since the Company suffered harm from costs associated with an SEC investigation, additional accounting expenses, and loss in investor confidence.[7] If the 2005 proxy statement had properly disclosed the stock option grant manipulation, then shareholders likely would have voted

---

7. The Plaintiffs also argue that the Company was harmed because it paid compensation to the directors after April 13, 2005. They argue that the directors would have been replaced if the 2005 proxy statement had properly disclosed their actions. But the Plaintiffs fail to allege that the directors were paid anything more than what the Company would normally pay a director. Thus, if the directors had been replaced, the Company presumably would have paid the same amount of money, albeit to different directors. The Plaintiffs would essentially have Section 14(a) apply anytime a director commits a bad act and is re-elected without the bad act being disclosed in the proxy statement. Such a broad reading of Section 14(a) is untenable, since it would essentially negate the transactional causation requirement.

against the incumbent directors and amendments to the 1997 Plan, and the Company would have taken corrective action earlier.

Reliance on *Zoran* does not assist the Plaintiffs, however, because the harms alleged by the Plaintiffs pre-date the 2005 proxy statement. Correcting a proxy misstatement might prevent future option grants from being manipulated but cannot change the impact of stock options that have already been granted. Even if the 2005 proxy statement had disclosed the actions of the directors, the fallout from the SEC investigation and the accounting restatement would still occur since the allegedly manipulated stock options had already been granted. What was at issue in *Zoran*, 511 F.Supp.2d at 1016 ("With each election, the board could continue to grant backdated stock options to itself and Zoran executives."), and what the Plaintiffs fail to allege in this case are manipulated stock option grants that *post-date* the 2005 proxy statement.

Transactional causation for stock option grant manipulation customarily involves a three-step-process. First, there is a stock option grant manipulation that pre-dates a proxy statement. Then, there is a false or misleading proxy statement that leads to approval of the recommended action, generally the reelection of directors or the amendment of the Company's stock option plan. Finally, these directors grant additional manipulated stock options. This is the scenario alleged in *Zoran* and the Plaintiffs argue that the same situation exists with iBasis. They have alleged the first two requirements but have failed to allege the last required step, that any related—but not essentially preexisting—injury occurred *after* the shareholders approved the recommended action in the proxy statement. The Plaintiffs have failed to establish the required transactional causation linking a vote in favor of the April 13, 2005 proxy statement with new injury to iBasis.

## C. The Lack of a Private Right of Action Under Section 304 of the Sarbanes–Oxley Act of 2002 ("SOX")

■ Count II of the Complaint, a claim against Gneezy and Tennant for violating Section .304 of SOX, can only proceed if Congress actually provided a private right of action to enforce this section. After reviewing the statutory text, the structure of other sections within SOX, and the decisions of other courts, I find that no private right of action exists for the enforcement of Section 304 violations.

Because the text of Section 304[8] does not explicitly grant a private right of action, I turn to other sources for guidance.

---

**8.** Section 304 states:

(a) Additional compensation prior to noncompliance with Commission financial reporting requirements

If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—

(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial documents embodying such financial reporting requirement; and

(2) any profits realized from the sale of securities of the issuer during that 12-month period.

(b) Commission exemption authority

The Commission may exempt any person from the application of subsection (a) of this section, as it deems necessary and appropriate.

15 U.S.C. § 7243.

Whether Congress intended to create a Section 304 private right of action can be gleaned from the structure of the statute's other sections. *See Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). Although Section 304 is silent, Sections 303 and 306 explicitly address this issue, with the former limiting enforcement to the Securities and Exchange Commission ("SEC") and the latter granting a private right of action.[9] *See* 15 U.S.C. § 7242(b); 15 U.S.C. § 7244(a)(2)(B).

As *Neer v. Pelino*, 389 F.Supp.2d 648 (E.D.Pa.2005) observed: "Sections 304 and 306 share an important characteristic in that each provides for issuers to be reimbursed with wrongdoing officers' profits" while Section 303 does not. 389 F.Supp.2d at 655. By contrast, Section 303 covers SEC enforcement against officers and directors who improperly influence an accountant's performance of a financial statement audit. 15 U.S.C. § 7242. "Given the similarity of Sections 304 and 306, a comparison of these two sections' enforcement language is more telling than comparisons with [Section] 303". *Neer v. Pelino*, 389 F.Supp.2d at 655. I too find the text of Section 306 to be the most analogous to Section 304. The explicit grant of a private right of action in Section 306 persuades me that Congress, which explicitly authorized no such private right of action in Section 304, cannot be viewed as intending to do so by implication.

The type of remedy provided by Section 304 further convinces me that no right of private action exists for this section. The language of Section 304 allows for the possibility of a remedy that is punitive in nature. If the company is required to issue an accounting restatement due to the company's material noncompliance with any securities law financial reporting requirement "as a result of misconduct", the CEO and CFO of the company are required to pay back the bonus and incentive or equity-based compensation that they received over a twelve-month period. 15 U.S.C. § 7243(a)(1). Section 304 does not elaborate on what sort of misconduct is necessary, so the pay back remedy could be applied if any misconduct, however slight, leads to an accounting restatement. Remedies that provide greater sanctions than placing a victim in the position it would have been in had improper conduct not taken place are customarily administered by government regulators and not private citizens. Without language explicitly granting a private right of action, I cannot find that Congress intended to have the Section 304 remedy administered by private citizens.

Although First Circuit courts have yet to consider whether Section 304 provides a private right of action, all other courts that have had the occasion to address the issue directly have found that Congress did not create a private right of action for purposes of enforcing Section 304 of SOX. *See In re Goodyear Tire & Rubber Co. Derivative Litig.*, 2007 WL 43557, at *7 (N.D.Ohio Jan.5, 2007); *In re Digimarc Corp. Derivative Litig.*, Civil Action No. 05–1324–HA, 2006 WL 2345497, at *3 (D.Or. Aug.11, 2006); *Kogan v. Robinson*, 432 F.Supp.2d 1075, 1082 (S.D.Cal.2006); *In re Whitehall Jewellers, Inc. Shareholder Derivative Litig.*, No. 05 C 1050, 2006 WL 468012, at *8 (N.D.Ill. Feb.27, 2006); *In re BISYS Group Inc. Derivative Ac-*

---

**9.** Section 804(c) also addresses the creation of a private right of action by stating: "Nothing in this section shall create a new, private right of action." Public Company Accounting and Investor Protection Act, Pub.L. No. 107– 204 § 804, 116 Stat. 745, 801 (2002). But this section is inapposite because it serves as the statute of limitations on the commencement of civil actions and does not cover any substantive SOX violation. *See* 28 U.S.C. § 1658.

tion, 396 F.Supp.2d 463, 464 (S.D.N.Y. 2005); *Neer v. Pelino*, 389 F.Supp.2d at 657; *Mehlenbacher v. Jitaru*, No. 6:04CV1118ORL–22KRS, 2005 WL 4585859, at *10 (M.D.Fla. June 6, 2005). The Plaintiffs do cite one case, *In re Qwest Communications Int'l, Inc. Sec. Litig.*, 387 F.Supp.2d 1130 (D.Colo.2005), for the proposition that courts have "suggested a private right of action exists under § 304." But *Qwest* never directly addressed the private right of action issue. Instead, that case was dismissed because the plaintiff failed to bring a derivative claim on behalf of the company and would not in any event itself be entitled to receive reimbursement under Section 304. *Id.*

Although the text of Section 304 is not explicit about the question, I am persuaded by the statutory structure of SOX, the nature of the penalty provision, and precedent from other courts that have directly and thoughtfully considered the issue that Congress did not intend to provide a private mechanism for enforcing Section 304. Thus, I find that the Plaintiffs have no private right of action to bring a claim under Section 304.

### D. State Law Claims

My jurisdiction over the remaining claims exists through supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Having dismissed both federal claims and given the early stage of litigation, I decline to exercise supplemental jurisdiction.[10] *See, e.g., Gonzalez–De–Blasini v. Family Dept.*, 377 F.3d 81, 89 (1st Cir.2004); *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir.1998); *Rodriguez v. Doral Mort-*

gage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Accordingly, I will also dismiss the remaining state law claims and in doing so decline to address the motion to dismiss of Jonathan Draluck who is only implicated in state law claims raised by the Plaintiffs.

### III. Conclusion

For the reasons set forth more fully above, I dismiss the federal claims in this case and decline to exercise supplemental jurisdiction over the state law claims. Accordingly, I GRANT the iBasis Defendants' motion to dismiss this case without addressing any of the state law claims and direct the Clerk to DISMISS this case.

---

**10.** As a consequence, I do not address the Defendants' arguments that the case must be dismissed in its entirety because the Plaintiffs fail to meet strict pleading requirements of Fed.R.Civ.P. 23.1 because the Plaintiffs (1) have failed to show compliance with the contemporaneous stock ownership requirement of Rule 23.1(1) and (2) have failed to plead with particularity that demand was futile and thus excused. These arguments must await resolution, if necessary, under state procedural law, *see, e.g.,* Mass. R. Civ. P. 23.1, governing derivative actions in state courts.