**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

In re: DIGIMARC CORPORATION
DERIVATIVE LITIGATION.

GEORGE DIAZ, derivatively on
behalf of Digimarc Corporation,
                    *Plaintiff-Appellant,*

                    v.

BRUCE DAVIS; E. K. RANJIT;
PHILLIP J. MONEGO; PETER W.
SMITH; ALTY VAN LUIJT; BRIAN J.
GROSSI; JIM ROTH; JAMES T.
RICHARDSON; JOHN TAYSOM;
WILLIAM A. KREPICK; GEOFFREY
RHOADS; and DIGIMARC
CORPORATION, a Delaware
corporation,
                    *Defendants-Appellees.*

No. 06-35838

D.C. Nos.
CV-05-01324-HA
CV-05-01325-HA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
August 26, 2008—Seattle, Washington

Filed December 11, 2008

Before: Thomas G. Nelson, Michael Daly Hawkins, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

16229

## COUNSEL

Mark Umeda, Jeffrey Fink, and Rebecca Peterson, Robbins, Umeda & Fink, LLP, San Diego, California, for the appellant.

Adam Gonnelli, Lubna Faruqi, and Beth Keller, Faruqi & Faruqi, LLP, New York, New York, for the appellant.

Richard Baum, Julia Markley, and Banu Ramachandran, Perkins Coie LLP, Portland, Oregon, for the appellees.

**OPINION**

BYBEE, Circuit Judge:

George Diaz, sometime shareholder of Digimarc Corporation, filed this action derivatively on the corporation's behalf. Diaz alleges that the individual defendants, who are current and former officers and directors of Digimarc, breached their fiduciary duties to the corporation and its shareholders by issuing misleading financial statements and misrepresenting the business and prospects of Digimarc in violation of California corporations law and section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243. The district court dismissed his Sarbanes-Oxley claim on the grounds that there is no private cause of action for a violation of section 304 and then realigned Digimarc as a plaintiff, thereby destroying diversity jurisdiction over Diaz' state law claims. For the reasons explained below, we agree with the district court that there is no private right of action under section 304, and that the District of Oregon accordingly lacked federal question jurisdiction over the suit. We disagree, however, with the district court's realignment of Digimarc as plaintiff for the purpose of determining diversity jurisdiction and therefore remand to that court for proceedings consistent with this opinion.

I

On September 13, 2004, Digimarc, a publicly-traded Delaware corporation headquartered in Oregon (and a self-described "leading supplier of secure personal identification systems" including personal identification documents and driver licenses based on digital watermarking technology), publicly announced that, due to accounting errors, the corporation had likely overestimated earnings for the previous six quarters. The announcement cited the improper capitalization of internal software development costs as the most likely cause of these accounting errors. In short, the corporation had failed to record the costs of internal software development as

expenses on its balance sheet, thereby artificially inflating its net earnings over the relevant period.

Although the full extent of the accounting errors (approximately $2.7 million in overstated earnings) was not revealed until April 5, 2005, when Digimarc formally issued a restatement of earnings, class action lawsuits were filed within one month of the September 13, 2004, announcement. On September 28, 2004, a class action complaint alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act was filed (and eventually consolidated with two others) in the District of Oregon. *See Zucco Partners, LLC v. Digimarc Corp.*, 445 F. Supp. 2d 1201 (D. Or. 2006). The Appellant in this action, meanwhile, filed a shareholder derivative suit in early October against Digimarc and certain of its officers and directors in California Superior Court for San Louis Obispo County. This action, which was consolidated with a similar suit filed by Patrick Sheehan in the same court, pled state law claims for violations of California Corporations Code § 25402, breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment.

Other shareholders sought a more direct means of remediation. Shortly after the California Superior Court actions were filed, Christopher Beasley sent a letter to the Chair of Digimarc's Board of Directors demanding that the Board take action to rectify the alleged breaches of fiduciary duties described in the California Superior Court complaint. The letter specifically demanded the Board "commence a civil action against each of the Directors and Officers to recover for the benefit of the Company" damages for misconduct and disgorgement of bonuses, stock options, and other incentive compensation.

In response to the derivative actions and the demand letter, Digimarc created a Special Litigation Committee ("SLC") by board resolution on January 5, 2005, for the purpose of inves-

tigating the breaches of fiduciary duty alleged in the California Superior Court action and the Beasley letter. The Board endowed the SLC with the broad adjudicative power "to undertake and supervise any action necessary and appropriate to implement any [factual findings it made]," and to "determine whether or not the Company shall undertake or defend against any litigation against one or more of the present or former directors or officers of the company."

Initially, Alty van Luijt and Jim Roth, both directors of Digimarc named as defendants in the California Superior Court action, were appointed as sole members of the SLC. On June 6, 2005, however, van Luijt and Roth were replaced by Lloyd Waterhouse, Bernard Whitney, and William Miller— all board members of Digimarc who were not named as defendants in the California Superior Court action and who were not affiliated with the company during the time period at issue. The SLC also retained the law firm Farleigh Witt to assist in the investigation of claims against individual officers and directors. One of the SLC's initial actions was to send a letter dated February 25, 2005 to Beasley inviting him to participate in the investigation. The SLC did not send similar letters to Diaz or Sheehan at that time.

Digimarc's approach to the California action was decidedly less generous. The corporation moved in California Superior Court to dismiss the consolidated derivative action on grounds of *forum non conveniens*. This motion was granted on July 29, 2005, and the case was dismissed. The court conditioned its order to dismiss on an agreement by Digimarc and the individual defendants to submit to the jurisdiction of an Oregon state court (in which Beasley, unsatisfied with the SLC's letter, had also filed a derivative action), and an agreement that the statute of limitations pertaining to any claims based on the same facts alleged in the California Superior Court actions would be tolled from the date of filing the California Superior Court actions.

Instead of filing in Oregon state court, however, Diaz and Sheehan each added a Sarbanes-Oxley claim and brought separate derivative actions in the District Court for the District of Oregon on August 25, 2005. Specifically, these actions asserted claims for disgorgement under section 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243, and state law claims for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the California Corporations Code. The actions further alleged that the individual defendants, the directors and officers of Digimarc,[1] were liable to Digimarc for an unspecified sum of damages and declaratory and equitable relief. The district court consolidated the actions on September 29, 2005.

On September 9, 2005, shortly after the district court actions were filed, the SLC sent a letter to counsel for Diaz and Sheehan, inviting them to "have input in our investigation" and to participate in the next committee meeting on October 5, 2005. Three days later, the SLC sent another letter to Beasley's counsel, advising him of the committee meeting and the ongoing investigation.

A little over a month later, on October 17, 2005, the individual defendants in this case filed a motion to dismiss the consolidated complaint for lack of jurisdiction, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The individual defendants argued that because section 304 of the

---

[1]The verified shareholder derivative complaint filed by Patrick Sheehan specifically named as defendants Bruce Davis, CEO and Chairman of the Board of Digimarc; E. K. Ranjit, CFO and Treasurer of Digimarc until 2004; Geoffrey Rhoads, Chief Technology Officer and director of Digimarc until 2003; Phillip Monego, director of Digimarc since 1996; Peter Smith, director of Digimarc since 2000; Alty van Luijt, director of Digimarc since 2000; Brian Grossi, director of Digimarc since 2000; Jim Roth, director of Digimarc since 2003; James Richardson, director of Digimarc since 2003; John Taysom, director of Digimarc until 2003; and William Krepick, director of Digimarc until 2004.

Sarbanes-Oxley Act did not create a private right of action, the district court could not assert federal question jurisdiction over that claim, and that because Digimarc corporation should be aligned as a plaintiff in the action, the parties were not diverse and the district court lacked jurisdiction over the plaintiffs' remaining state law claims.

Meanwhile, after the motion to dismiss was filed but before the district court ruled, the SLC finished its investigation and reported its findings and recommendations on February 18, 2006. The SLC concluded that "[w]ith respect to the facts, . . . there was insufficient evidence to establish that any of the defendants violated applicable standards of conduct, intentionally or otherwise," and that "the evidence overwhelmingly indicated that . . . there was simply no malfeasance or nonfeasance such that would entitle the Company (or someone suing on its behalf) to prevail on any of the claims alleged in the Derivative Litigation." Accordingly, the SLC recommended that "the defendants' substantial defenses, and the risks, costs, and burden of litigation . . . establish[ ] that pursuit of the Derivative Litigation [is] not in the best interest of the Company and its shareholders."

The district court subsequently granted the individual defendants' motion to dismiss on August 11, 2006. The district court concluded that there was no private right of action under section 304, and thus that "plaintiffs lack[ed] standing to assert the only federal law claim alleged in the Complaint." Additionally, the district court held that Digimarc should be aligned as a plaintiff in the action because the company was not "actively antagonistic" to the derivative plaintiffs. Once Digimarc was realigned as a plaintiff, the district court dismissed the remaining claims for lack of diversity jurisdiction. Diaz filed a timely appeal to this court.

Diaz appeals both grounds. First, he argues that the district court had federal question subject matter jurisdiction because section 304 of the Sarbanes-Oxley Act permits a cause of

action. Second, he argues that even if the district court lacked federal question jurisdiction, the district court should not have realigned Digimarc as a plaintiff and, consequently, the district court had diversity jurisdiction over the state law claims. We consider each claim in turn.

## II

Diaz first contends that the district court erred in determining that section 304 of the Sarbanes-Oxley Act does not contain a right of action allowing private parties to sue for noncompliance. We review a district court's decision involving interpretation of a federal statute *de novo. Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 877 n.12 (9th Cir. 2006).

Section 1331 of Title 28 grants federal district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Additionally, 28 U.S.C. § 1367(a) furnishes district courts with supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." The only basis Diaz asserts for federal question jurisdiction is section 304 of the Sarbanes-Oxley Act. If private plaintiffs have a right of action to sue under section 304, the District of Oregon had subject matter jurisdiction over both the Sarbanes-Oxley claim and the state law claims asserted in this case. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 808 (1986); *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916) (opinion of Holmes, J.) ("[A] suit arises under the law that creates the cause of action."). If, however, section 304 does not contain a private right of action, the district court properly dismissed the Sarbanes-Oxley claim for lack of subject matter jurisdiction, *see Merrell Dow Pharms.*, 478 U.S. at 807-12.

[1] Section 304 of the Sarbanes-Oxley Act of 2002 provides for the forfeiture of certain bonuses and profits when

corporate officers fail to comply with securities law reporting requirements. The statute provides in relevant part:

> (a)   Additional compensation prior to noncompliance with Commission financial reporting requirements
>
> If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for—
>
> (1)   any bonus or other incentive-based or equity based compensation received by that person from the issuer during that 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and
>
> (2)   any profits realized from the sale of securities of the issuer during the 12-month period.

15 U.S.C. § 7243(a). The statute also allows the Securities and Exchange Commission to exempt "any person" from the effect of the forfeiture penalty. 15 U.S.C. § 7243(b).

**[2]** "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (quotation omitted). Instead, the statute must either explicitly create a right of action or implicitly contain one. *Id*. at 575. Whether this language contains a private right of action is a question of first impression in this court.

A

**[3]** Section 304 does not explicitly create a private right of action because nothing in the text of the section makes any mention of a cause of action. Other sections of the Sarbanes-Oxley Act demonstrate how Congress expressly creates private rights of action. Section 306, for example, provides that "[a]n action to recover profits in accordance with this subsection *may be instituted at law or in equity* in any court of competent jurisdiction by the issuer, or *by the owner of any security of the issuer . . . .*" 15 U.S.C. § 7244(a)(2)(B) (emphasis added). By contrast, section 304 does not mention the availability of any action to enforce its mandates, nor does it explicitly describe a forum in which suit may be brought or a plaintiff for whom such a forum is available. Accordingly, any private right of action within section 304 must be implied from the statute's language, structure, context and legislative history. *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 836 (9th Cir. 2004).

B

We next turn to whether section 304 creates an implied private right of action. So far as we can determine, no circuit has yet answered this question, except in dicta. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, No. 07-7108, ___ F.3d ___, 2008 WL 3166142, at *10 (D.C. Cir. Aug. 8, 2008) (holding that defendant's directors' decision not to bring suit under section 304 for disgorgement by CEO and CFO was within the business judgment rule, since "§ 304 does not create a private right of action"). However, a number of district courts have squarely addressed the issue and have concluded that there is no such right. *See Pedroli ex rel. Microtune, Inc. v. Bartek*, 564 F. Supp. 2d 683, 685-86 (E.D. Tex. 2008); *In re Diebold Derivative Litig.*, Nos. 5:06CV0233, 5:06CV0418, 2008 WL 564824, at *2 (N.D. Ohio Feb. 29, 2008); *In re iBasis, Inc. Derivative Litig.*, 532 F. Supp. 2d 214, 223-25 (D. Mass. 2007); *In re Infosonics*

*Corp. Derivative Litig.*, No. 06cv1336 BTM (WMc), 2007 WL 2572276, at *8-9 (S.D. Cal. Sept. 4, 2007); *In re Goodyear Tire & Rubber Co. Derivative Litig.*, Nos. 5:03CV2180, 5:03CV2204, 5:03CV2374, 5:03CV2468, 5:03CV2469, 2007 WL 43557, at *7 (N.D. Ohio Jan. 5, 2007); *Kogan v. Robinson*, 432 F. Supp. 2d 1075, 1082 (S.D. Cal. 2006); *In re Whitehall Jewellers, Inc. S'holder Derivative Litig.*, No. 05 C 1050, 2006 WL 468012, at *8 (N.D. Ill. Feb. 27, 2006); *In re BISYS Group Inc. Derivative Action*, 396 F. Supp. 2d 463, 464 (S.D.N.Y. 2005); *Neer v. Pelino*, 389 F. Supp. 2d 648, 657 (E.D. Pa. 2005); *Mehlenbacher v. Jitaru*, No. 6:04CV1118ORL-22KRS, 2005 WL 4585859, at *10 (M.D. Fla. June 6, 2005).

**[4]** Where a federal statute does not explicitly create a private right of action, a plaintiff can maintain a suit only if "Congress intended to provide the plaintiff with a[n implied] private right of action." *First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121 (9th Cir. 2000). If not express, a right of action must be implied because "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citing *Touche Ross*, 442 U.S. at 578). In the absence of clear evidence of congressional intent, we may not usurp the legislative power by unilaterally creating a cause of action. *Touche Ross*, 442 U.S. at 578 ("The ultimate question is one of congressional intent, not one of whether this Court thinks that it can improve upon the statutory scheme that Congress enacted into law."). Accordingly, "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander*, 532 U.S. at 286 (citing *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15 (1979)).

The Supreme Court has created a four-factor test for determining the existence of an implied private right of action "in a statute not expressly providing one." *Cort v. Ash*, 422 U.S. 66, 78 (1975). A court determining whether a private right of

action is implied in a statute must consider (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted—that is, [whether] the statute create[s] a federal right in favor of the plaintiff"; (2) whether "there [is] any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether the cause of action is "consistent with the underlying purposes of the legislative scheme"; and (4) whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Id.* (internal quotations and citations omitted).

In analyzing the *Cort* factors we will focus on the second factor ("whether Congress intended to provide the plaintiff with a private right of action") as "the key inquiry in this calculus." *Opera Plaza*, 376 F.3d at 835. *See also Orkin v. Taylor*, 487 F.3d 734, 739 (9th Cir. 2007) ("Indeed, the three *Cort* questions that are not explicitly focused on legislative intent are actually indicia of legislative intent, such that the *Cort* test itself is focused entirely on intent."). Here, congressional intent weighs decisively against finding a private right of action. "We . . . begin . . . our search for Congress's intent with the text and structure of [the statute]." *Alexander*, 532 U.S. at 288; *see also Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text . . . ."). In conducting this examination, we must consider "the entire statutory scheme provided by Congress in determining if a private cause of action exists, noting that analogous provisions expressly providing for private causes of action can imply congressional intent not to create an implied cause of action." *Opera Plaza*, 376 F.3d at 836 (citing *Touche Ross*, 442 U.S. at 571-74).

**[5]** The language of section 304 is at best ambiguous about an intent to create a private right of action. Diaz argues that section 304's language is analogous to that of section 901(a)

of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which the Supreme Court found to contain an implied private right of action. *See Cannon v. University of Chicago*, 441 U.S. 677 (1979). It is clear, however, that the "rights-creating' language so critical to the Court's analysis in *Cannon*" is "completely absent" (*Alexander*, 532 U.S. at 288) from section 304. Unlike section 901(a), which expansively provides that "no person . . . shall be subjected to discrimination under any program or activity receiving Federal financial assistance," *see* 20 U.S.C. § 1681(a), section 304 does not create a right to disgorgement in shareholders. Instead, it speaks in terms of the remedy, detailing when and under what circumstances a CEO and CFO must reimburse an issuer. *See* 15 U.S.C. § 7243(a) ("[T]he chief executive officer and chief financial officer of the issuer shall reimburse the issuer . . . .").

**[6]** The fact that both Title IX and section 304 use the hortatory "shall" is irrelevant. It is the "no person" language in Title IX, conspicuously absent from section 304, which gives Title IX its remunerative force. Section 304 focuses on "the person regulated" rather than the "individual[ ] who will ultimately benefit from [the statute's] protection," and thus does not provide a private right of action. *Alexander*, 532 U.S. at 289.

Although the language and structure of section 304 do not indicate congressional intent to create a private right of action, we must also "examine the entire statutory scheme provided by Congress" to satisfy our inquiry into legislative intent. *Opera Plaza*, 376 F.3d at 836. Where "analogous provisions" expressly provide for a private right of action, we must infer that Congress did not intend to create a private right of action in the statutory section at issue, *see id.*, because "when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly." *Touche Ross*, 442 U.S. at 572.

Here, Appellant and Appellees debate which is the most "analogous provision" within the Act with which to compare section 304. Diaz points to section 303, which prohibits officers and directors from "tak[ing] any action to fraudulently influence, coerce, manipulate, or mislead any independent public or certified accountant" for the purpose of creating misleading financial statements. 15 U.S.C. § 7242(a). Diaz notes that section 303, unlike section 304, contains a specific *restriction* on private enforcement—it gives the Commission "exclusive authority to enforce this section." *Id.* § 7242(b). Diaz also cites section 804, which amended 28 U.S.C. § 1658's statute of limitations period for certain actions and provides that "nothing in this section shall create a new, private right of action." Pub. L. No. 107-204, Title VII, § 804(c), 116 Stat. 801. Appellees, meanwhile, highlight section 306, which prohibits insider trading during "pension fund blackout periods" and requires a disgorgement of profits from officers and directors who engage in such trading. 15 U.S.C. § 7244. Section 306, unlike section 304, explicitly creates an "action to recover profits" that "may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer [under certain circumstances]." *Id.* § 7244(a)(2)(B).

Diaz cannot satisfy his burden to show that section 304 creates a private right of action by pointing to other sections in Sarbanes-Oxley that expressly disclaim private enforcement. It would turn *Cort* on its head to hold that by making clear it did *not* intend to create a private right of action in sections 303 and 804, Congress affirmatively *intended* to create rights of action in sections where it omitted such an express denial. Furthermore, section 804 does not create a new remedial scheme—instead, it merely extends a statute of limitations for certain actions and adds prophylactic rather than new private-right-of-action language.

**[7]** Sections 304 and 306, meanwhile, *both* require noncompliant directors and officers to reimburse the issuer by

disgorging the profits of their noncompliance. *Compare* 15 U.S.C. § 7243(a)(1) ("[T]he chief executive officer and chief financial officer of the issuer shall reimburse the issuer."), *with* 15 U.S.C. § 7244(a)(2)(A) ("Any profit realized by a director or executive officer . . . shall inure to and be recoverable by the issuer."). It is true that both sections' disgorgement remedies are equitable (in the sense that they require wrongdoers to reimburse the issuer for ill-gotten gains) and that we have previously acknowledged that where the statutory remedy is "an equitable one, we are more inclined to perceive in Congress' silence a presumption that an individual may pursue a claim." *Helfer*, 224 F.3d at 1125. But setting section 304 against section 306 prevents us from reading an *implied* private right of action into section 304. Again, in addition to creating the disgorgement remedy, section 306 also *expressly* creates a private right of action to enforce this remedy. 15 U.S.C. § 7244(a)(2)(B). Accordingly, we cannot find in Congress' silence in section 304 an intent to create a private right of action where it was not silent in creating such a right to similar equitable remedies in other sections of the same Act.[2] *Opera Plaza*, 376 F.3d at 836 (citing *Touche Ross*, 442 U.S. at 571-74).

Because the text and the structure of the Sarbanes-Oxley Act do not demonstrate an intent to create a private right of

---

[2]Diaz suggests that the structure of the remedy under section 306 required Congress to spell out the private remedy in that section but not under section 304. Specifically, Diaz claims that section 306, unlike section 304, has a demand requirement that compels a shareholder bringing a private right of action under section 306 first to make a demand on the directors of the issuer to bring the action before maintaining it derivatively. *See* 15 U.S.C. § 7244(a)(2)(B). To the extent this argument has any merit, however, it cannot explain why Congress also explicitly gave the *issuer* a private action to disgorge under section 306 but not section 304. *See id.* ("An action to recover profits in accordance with this subsection may be instituted at law or in equity in any court of competent jurisdiction *by the issuer, or* by the owner of any security of the issuer [who has satisfied the demand requirement].") (emphasis added).

action under section 304, we need not delve into the first (federal right in plaintiff's favor), third (general statutory purpose), and fourth (nature of the action) *Cort* factors. As we have previously recognized, "[t]hat the first two *Cort* factors weigh against finding a private right of action is dispositive of our inquiry." *Opera Plaza*, 376 F.3d at 837 (citing *California v. Sierra Club*, 451 U.S. 287, 297 (1981)); *Oliver v. Sealaska Corp.*, 192 F.3d 1220, 1224 (9th Cir. 1999)). Even if we assume that Diaz would prevail under the first *Cort* factor, this is not enough to offset the clear text and structure of section 304. We also observe that nothing that Diaz has argued with respect to the third or fourth *Cort* factors calls into question our conclusion. *See Neer*, 389 F. Supp. 2d at 655-57 (analyzing the legislative history of section 304 and determining that nothing in the legislative history demonstrates congressional intent to create a private right of action).

[8] Accordingly, we conclude that section 304 does not create a private right of action. Because Diaz's section 304 claim was the only basis for federal question jurisdiction, the district court correctly determined that it lacked federal question jurisdiction over Diaz's suit. Thus the only possible basis for the district court's jurisdiction over the plaintiff's remaining state law claims is diversity.[3]

---

[3]Despite lacking federal question jurisdiction, a district court may in some circumstances exercise supplemental jurisdiction over state law claims which accompanied a dismissed federal claim. *See* 28 U.S.C. § 1367. Under 28 U.S.C. § 1367(c), however, a district court may decline to exercise supplemental jurisdiction over state law claims where, as here, "the district court has dismissed all claims over which it had original jurisdiction." This decision "lies within the district court's discretion," *see Foster*, 504 F.3d at 1051, and is reviewed for abuse of such discretion. *See Acri v. Varian Assoc., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). Because neither party has raised the issue of supplemental jurisdiction, however, "we are not required, *sua sponte*, to decide whether the district court abused its discretion under § 1367(c)." *Id.*

## III

Diaz argues that subject matter jurisdiction over the remaining state law claims may be maintained on diversity grounds because the district court's decision to realign Digimarc Corporation as a plaintiff (thereby destroying diversity jurisdiction) was error. We review the district court's legal conclusions de novo, *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 979 (9th Cir. 2005), and its factual determinations "necessary to establish diversity jurisdiction" for clear error. *Kroske*, 432 F.3d at 979. *Cf. Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 872-73 (9th Cir. 2000) ("The issue of alignment for purposes of diversity jurisdiction requires a court to look beyond the pleadings to the actual interest of the parties."). Because we find there was antagonism between the derivative plaintiffs and Digimarc's directors and officers at the time the suit was filed, we conclude that the district court erred in its decision to realign the corporation as a plaintiff.

## A

**[9]** Section 1332 of Title 28 confers jurisdiction on federal courts where there is diversity of citizenship between plaintiffs and defendants. Diversity jurisdiction requires complete diversity between the parties—each defendant must be a citizen of a different state from each plaintiff. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806). This requirement would be satisfied if the parties were aligned as asserted in the complaint: while Diaz and Sheehan are citizens of New York, the individual defendants are citizens of California, Oregon, the Netherlands, and the United Kingdom; and Digimarc is incorporated in Delaware and has its principal place of business in Oregon. *See* 28 U.S.C. § 1332(a)(1), (a)(2), (c)(1).

Although the plaintiff is generally the master of his complaint, diversity jurisdiction "cannot be conferred upon the federal courts by the parties' own determination of who are

plaintiffs and who defendants." *City of Indianapolis v. Chase Nat'l Bank of City of New York*, 314 U.S. 63, 69 (1941). Instead, a court must realign the parties in order to protect our judgments against artful pleading and ensure an actual "collision of interest." *Id.* (quoting *Dawson v. Columbia Ave. Sav. Fund, Safe Deposit, Title & Trust Co.*, 197 U.S. 178, 181 (1905)); *Dolch v. United Cal. Bank*, 702 F.2d 178, 181 (9th Cir. 1983). The court should determine the "collision of interest" by reference to the "principal purpose of the suit" and not mere "mechanical rules." *Chase*, 314 U.S. at 69-70.

B

Because a derivative lawsuit brought by a shareholder is "not his own but the corporation's," the corporation "is the real party in interest" and usually properly aligned as a plaintiff. *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522-23 (1947)). There is an exception, however, when a corporation's officers or directors are "antagonistic" to those of the shareholder plaintiff(s). *Smith v. Sperling*, 354 U.S. 91, 95-96 n.3 (1957) (citing *Doctor v. Harrington*, 196 U.S. 579, 587 (1905) ("The ultimate interest of the corporation made defendant may be the same as that of the stockholder made plaintiff, but the corporation may be under a control antagonistic to him, and made to act in a way detrimental to his rights.")). To determine whether antagonism exists, the court should look to "the face of the pleadings and . . . the nature of the controversy," *id.* at 96, because "the very individuals who have a stranglehold over the corporation are the people against whom suit is sought to be brought and, therefore, in any sense that has any meaning they are the defendants for that reason," *id.* at 103 (Frankfurter, J., dissenting).

A corporation is generally antagonistic to a shareholder plaintiff where "management is aligned against the stockholder and defends a course of conduct which he attacks," *Smith*, 354 U.S. at 95, or merely where "management—for good reasons or for bad—is definitely and distinctly opposed

to the institution of [the derivative] litigation," *Swanson*, 354 U.S. at 116. For example, where management "refuses to take action to undo a business transaction or whenever . . . it so solidly approves [of the transaction] that any demand to rescind would be futile," a court should find antagonism. *Smith*, 354 U.S. at 97.

C

Diaz objects to the district court's analysis of antagonism in two respects. First, he contends that the district court erred in failing to give dispositive weight to allegations of fraud and misconduct contained in the complaint. Second, he argues that the district court improperly considered events that occurred after the filing of the complaint—including the issuance of letters from Digimarc's Special Litigation Committee to Diaz and Sheehan inviting them to participate in the committee's private investigation—when it determined that Digimarc's officers and directors were not antagonistic to the maintenance of a derivative suit.

1

The scope of a district court's inquiry for purposes of antagonism was delimited in *Smith v. Sperling*, where the Supreme Court cautioned "that the proper course is not to try out the issues presented by the charges of wrongdoing but to determine the issue of antagonism on the face of the pleadings and by the nature of the controversy." 354 U.S. at 96.

Many courts have interpreted this admonition as normally preventing the judiciary from "launching an extended evidentiary inquiry" when a shareholder derivative complaint alleges fraud or malfeasance. *Gabriel v. Preble*, 396 F.3d 10, 15 (1st Cir. 2005). *See also Liddy v. Urbanek*, 707 F.2d 1222, 1224 (11th Cir. 1983); *Rogers v. Valentine*, 426 F.2d 1361, 1363 (2d Cir. 1970). Some courts have even concluded that if "the complaint in a derivative action alleges that the controlling

shareholders or dominant officials of the corporation are guilty of fraud or malfeasance, then antagonism exists" and no further analysis is necessary. *ZB Holdings, Inc. v. White*, 144 F.R.D. 42, 46 (S.D.N.Y. 1992); *see also, e.g.*, *Hildebrand v. Lewis*, 281 F. Supp. 2d 837, 846 (E.D. Va. 2003); *Trabucco v. Carlile*, 57 F. Supp. 2d 1074, 1076 (D. Or. 1999). These courts generally rely on the Court's observation in *Smith*, that "[t]he bill and answer normally determine whether the management is antagonistic to the stockholder." 354 U.S. at 96.

Other courts, however, have suggested that when determining the "nature of the controversy," *see Smith*, 354 U.S. at 96, judges may look to facts beyond the complaint and answer. *Reilly Mortgage Group, Inc. v. Mount Vernon Sav. & Loan Ass'n*, 568 F. Supp. 1067, 1074 (E.D. Va. 1983); *see also Lewis v. Odell*, 503 F.2d 445, 447 (2d Cir. 1974) (considering that "[t]he [defendant] has not only retained neutrality in its responses to appellant's complaints but has even reserved the right to take control of the action").

As we have previously recognized in non-derivative cases, a court determining alignment is permitted to " 'look beyond the pleadings' to the actual interest of the parties" and make "factual determinations of the type ordinarily left to the district court and reviewed for clear error." *Prudential Real Estate*, 204 F.3d at 872-73 (citing *City of Indianapolis*, 314 U.S. at 69). *Cf. Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing *Savage v. Glendale Union High School, Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1040 n.2 (9th Cir. 2003)) ("In resolving a [Rule 12(b)(1)] *factual* attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." (emphasis added)). Thus, mere allegations of fraud or malfeasance, without more, are not enough to determine conclusively the question of antagonism. *See Smith*, 354 U.S. at 97 ("This is a practical not a mechanical determination."). Instead, a court may consider not only the "face of the pleadings" but "the

nature of the controversy." *Id.* at 96. This is especially important in cases where, as here, the corporation has not yet answered the plaintiffs' complaint. Thus, the district court did not err in failing to give dispositive weight to allegations in the derivative complaint.

2

**[10]** The district court did err, however, when it considered facts that arose after the complaint was filed in federal court. It is well-established that "the jurisdiction of the court depends upon the state of things at the time of the action brought." *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824). A court should therefore "measure[ ] all challenges to subject-matter jurisdiction premised upon diversity of citizenship against the state of facts that existed at the time of filing —whether the challenge be brought shortly after filing, after the trial, or even for the first time on appeal." *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004). This is true "regardless of the costs" the rule entails. *Id.* Although the district court's inquiry is not confined to the face of the pleadings, its consideration of "the nature of the controversy," *Smith*, 354 U.S. at 96, should be limited to the facts and circumstances known at the time the suit was filed.

**[11]** In this case, the district court, when analyzing antagonism, supported its conclusion by noting that "Digimarc has not only taken no action directly opposed to plaintiffs' claims, but has cooperated with plaintiffs by investigating their claims actively and inviting them to participate in that investigation." Although Digimarc formed the Special Litigation Committee and began investigation before the plaintiffs' suit was filed on August 22, 2005, it did not send letters to the named plaintiffs inviting them to participate in the SLC's investigation until almost three weeks *after* the suit was filed, on September 9, 2005. Thus the district court's consideration of this evidence was erroneous.

The district court supported its decision to consider the invitation letters by concluding that the letters were "consistent" with an earlier invitation sent to the plaintiff in another derivative suit (Beasley) in response to a November 8, 2004 demand letter sent by Beasley to Digimarc. Although the Beasley invitation, dated February 25, 2005, was mailed before the commencement of the derivative suit, and thus properly considered by the district court in determining antagonism, its consistency with the subsequent letters to Diaz and Sheehan cannot justify consideration of the subsequent letters themselves. Such a consideration would transform the current time-of-filing rule into a nebulous standard and violate the Supreme Court's charge to "adhere[ ] to the time-of-filing rule regardless of the costs it imposes" in particular cases. *Grupo Dataflux*, 541 U.S. at 571.

D

**[12]** After evaluating the evidence, we find that antagonism was present between Diaz and the controlling members of Digimarc at the time the suit was filed. Diaz filed this action against eleven current and former board members of Digimarc, seven of whom remain on the board and can fairly be said to control the corporation. It is in the pecuniary interest of these controlling board members to oppose the derivative action, and all would be significantly harmed by an adverse judgment here. No court has failed to find antagonism under similar factual circumstances.

Courts that have realigned corporate defendants in shareholder derivative actions have looked to several factors when determining that the corporation was not actively antagonistic to the suit. Several courts have abstained from finding antagonism where the corporation was no longer controlled by the directors and officers named in the complaint. *See, e.g.*, *Lewis v. Odell*, 503 F.2d 445, 446-47 (2d Cir. 1974); *Taylor v. Swirnow*, 80 F.R.D. 79, 84 (D. Md. 1978); *In re Penn Central Sec.*

*Litig.*, 335 F. Supp. 1026, 1041-42 (E.D. Pa. 1971); *Tessari v. Herald*, 207 F. Supp. 432, 435-37 (N.D. Ind. 1962).

Other courts have found antagonism absent where the plaintiff, rather than the defendants, controls the corporation (either through majority stock ownership or other means). *See, e.g.*, *Liddy v. Urbanek*, 707 F.2d 1222, 1225 (11th Cir. 1983); *Nejmanowski v. Nejmanowski*, 841 F. Supp. 864, 868 (C.D. Ill. 1994); *Gibson v. BoPar Dock Co.*, 780 F. Supp. 371, 374 (W.D. Va. 1991); *Taylor*, 80 F.R.D. at 84. Likewise, courts have generally not found antagonism where the corporation is structurally incapable of acting to bring suit against its officers and directors—where the corporation is "deadlocked." *See, e.g.*, *Duffey v. Wheeler*, 820 F.2d 1161, 1162-63 (11th Cir. 1987); *Kartub v. Optical Fashions*, 158 F. Supp. 757, 758-59 (S.D.N.Y. 1958).

Although Federal Rule of Civil Procedure 23.1's pleading requirement does not directly implicate subject matter jurisdiction, several courts have considered the absence of a demand letter persuasive in finding no antagonism. *See, e.g.*, *Lewis*, 503 F.2d at 447; *Nejamanowski*, 841 F. Supp. at 867; *Tessari*, 207 F. Supp. at 435-37. *But cf. Smith*, 354 U.S. at 97 (holding that antagonism will exist when the corporation's management "so solidly approves [of a business transaction] that any demand to rescind would be futile").

Finally, some courts have refrained from finding antagonism where the corporation, although it has not yet filed suit against its officers and directors, has "reserved the right to take control of the action" or otherwise "retain[s] neutrality in its responses to appellant's complaints." *Lewis*, 503 F.2d at 447.

[13] Taking these various factors into consideration, and recognizing this is a close case, we conclude the company was antagonistic to Diaz's suit. Digimarc did take steps to address the shareholders' complaints. Once the first share-

holder derivative action was filed in California and Digimarc received Beasley's demand letter, the company created the SLC to investigate the allegations. Although the SLC initially consisted of two board members named in the California suit, Digimarc eventually replaced them with new board members, retained outside counsel, and invited Beasley to participate in its investigation.

**[14]** Notwithstanding the creation of the SLC, however, we weigh heavily that a majority of the members of the corporation's board were named as defendants in the derivative action. *Cf. id.* at 446-47 (corporation was managed that the time of the action by bankruptcy trustees who were not named in the complaint). Additionally, we note that neither of the plaintiffs was a majority shareholder in Digimarc or had the means otherwise to control the corporation's actions. There is also no indication in the record that Digimarc was structurally incapable of bringing suit against its officers and directors—in fact, the corporation specifically delegated the power to file such an action to the SLC. Finally, although neither Diaz nor Sheehan sent Digimarc a formal demand letter requesting that it bring suit upon the officers and directors, Beasley's separate demand letter of November 8, 2004 gave the corporation ample opportunity to respond to shareholder demand for a lawsuit long before Diaz filed his derivative action in August 2005. In the end, Digimarc's creation of the SLC was not enough to offset the remaining evidence that "management—for good reasons or for bad—[was] definitely and distinctly opposed to the institution of this litigation." *Swanson*, 354 U.S. at 116.

E

Finally, the individual defendants argue that Digimarc's grant of power to the SLC makes jurisdiction premature—i.e., that the district court must await the findings of the committee before exercising its power over the derivative action. Although the formation of the SLC is one indication that

Digimarc's management may not be averse to the derivative suit since it has "reserved the right to take control of the action," *Lewis*, 503 F.2d at 447, we cannot accord this factor dispositive weight without undermining *Smith*'s distinction between issues of jurisdiction and issues for trial, 354 U.S. at 97 ("[A trial] may show a dispute that lies within the penumbra of business judgment, unaffected by fraud. But that issue goes to the merits, not to jurisdiction."). Otherwise, to determine whether it had jurisdiction, a court would have to evaluate whether an SLC were independent, whether it had been formed in good faith, and whether it instituted a reasonable investigation to determine liability *before* the committee had completed its investigation and recommended a course of action—an inquiry contrary to our instructions that "all challenges to subject-matter jurisdiction premised upon diversity [must be measured] against the state of facts that existed at the time of filing." *Grupo Dataflux*, 541 U.S. at 571.

IV

Accordingly, we hold that there is no private right of action under section 304 of the Sarbanes-Oxley Act and that Digimarc's managers and directors were antagonistic to Diaz's derivative suit at the time of filing for the purposes of establishing diversity jurisdiction. We remand to the district court for proceedings consistent with this decision.

AFFIRMED in part, REVERSED in part, and REMANDED. The parties are to bear their own costs on appeal.